PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BEAVERKETTLE FARMS, LTD., | ) | |
| | ) | CASE NO. 4:11CV02631 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| CHESAPEAKE APPALACHIA, LLC, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** [Resolving ECF Nos. 28, 33] |

This controversy is before the Court as a result of a dispute over the enforceability of an oil and gas lease ("the Lease").  Plaintiff Beaverkettle Farms, Ltd. ("Beaverkettle"), seeks a declaratory judgment that the Lease is no longer valid and that Defendant Chesapeake Appalachia, LLC ("Chesapeake"), has no right to conduct hydraulic fracturing,[1] or "fracking," on its land.  Chesapeake seeks a  declaration that the Lease continues to be in force, and, in addition, that Chesapeake has no current obligation to pay "delay rental" fees to Beaverkettle.

Presently, the parties call upon the Court to resolve cross-motions for summary judgment. ECF Nos. 28 and 33.  They have filed supporting memoranda of law, ECF Nos. 29 and 33, opposition briefs, ECF No. 34 and 35, and reply briefs, ECF Nos. 39 and 40.  Having reviewed and considered the parties' arguments, as well as the record and the governing legal principles, the Court denies each party's motion for the reasons articulated below.

---

[1] Hydraulic fracturing is a technique used to produce economically viable quantities of oil and natural gas by injecting fluids under pressures great enough to fracture rock formations such as shale, tight sands, and coalbeds, in order to extract the oil and gas contained within. *See* U.S. Environmental Protection Agency, Study of the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources, Progress Report, p.5 (December 2012).

# I. Factual and Procedural History

## A. Factual Background

Beaverkettle owns 4,108 acres of land ("the Property") spanning Columbiana County in Ohio and Beaver County in Pennsylvania.  ECF No. 7 at 4.  On May 5, 2004, Beaverkettle and O&G Investment Holdings, LLC ("O&G"), entered into the Lease in question.  ECF No. 7 at 3.  The Lease granted O&G the right to explore and drill for oil and gas on the Property in exchange for certain consideration, including royalty payments for any minerals found and extracted.  ECF No. 29-1.  The Lease was to last for a term of seven years "and so much longer thereafter" as oil and gas were found on the Property, or as O&G "operated" the Property in the search for oil and gas.  ECF No. 29-1 at 1.  The Lease also provided that it will become "null and void" unless O&G began drilling a well on the Property within twelve months of the date of the Lease, or unless O&G paid "delay rentals" of $10 per acre for every acre not contained within an "approved drilling plat."  ECF No. 29-1 at 1.  Although O&G did not drill on the Property during the period in which it held the Lease, it kept the Lease alive by timely submitting delay rentals to Beaverkettle.  ECF No. 29 at 27.

Within the first seven years of the agreement ("the primary term"), O&G assigned its exploration and drilling rights to Chesapeake on June 8, 2010.  ECF No. 7 at 3.  Chesapeake, like O&G, did not drill on the Property.  *See* ECF No. 29 at 22.  Although Chesapeake paid delay rentals to Beaverkettle for the remainder of the primary term, it failed to timely pay delay rentals after the primary term expired on May 5, 2011.  ECF No. 29 at 27.

In the months leading up to May 5, 2011, Chesapeake and Beaverkettle engaged in discussions regarding Chesapeake's proposal to consolidate a portion of the Property with an

adjoining parcel of land owned by James Tharp in order to form an "oil and gas development unit" ("the Tharp Unit").  ECF No. 7 at 8.  Chesapeake informed Beaverkettle that it desired to drill a horizontal Utica Shale well on Tharp's land with a portion of the "horizontal lateral" running underneath the Property.  ECF No. 29-11.  Notably, in accordance with the terms of the Lease, a well drilled on a properly consolidated unit shall "be deemed to be located upon the leased premises within the meaning and for the provisions and covenants of [the] Lease."  ECF No. 29-1 at 3.  The Lease required Chesapeake to "effect such consolidation" by executing a declaration of consolidation and recording the document in the office of the local county recorder.  ECF No. 29-1 at 3.  Prior to May 5, 2011, Chesapeake recorded the declaration and began drilling the well ("the Tharp 3H well") on Tharp's land within the consolidated Tharp Unit.  ECF Nos. 1-1 at 51-53; 29-11; 29-27; 29 at 22. Significant to this litigation, Chesapeake never obtained Beaverkettle's approval for the Tharp Unit, even though the Lease conferred upon Beaverkettle the right to "approve drill units" so long as the approval is not "unreasonably" withheld or delayed.  ECF No. 29-1 at 5.

On May 19, 2011, Beaverkettle informed Chesapeake that the Lease had terminated at the expiration of the primary term because Chesapeake had neither discovered oil and gas on the Property nor operated the Property in the search for oil and gas.  ECF No. 1-1 at 40-41.  Chesapeake responded on May 26, 2011, and communicated its belief that the Lease remained "in full force and effect" due to Chesapeake's actions in search for oil and gas within the Tharp Unit prior to the expiration of the primary term.  ECF No. 1-1 and 42.

This litigation ensued to adjudicate Beaverkettle's and Chesapeake's rights and obligations with respect to the Lease.

**B. Procedural History**

Beaverkettle initiated the lawsuit by filing a complaint in the Columbiana County, Ohio, Court of Common Pleas.  ECF No. 1-1.  Beaverkettle sought a declaratory judgment that the Lease had terminated, on May 5, 2011, pursuant to its terms, and, even had the Lease been extended past that date, it was null and void as a result of Chesapeake's failure to timely pay delay rentals.  ECF No. 1-1.  Chesapeake then removed the case to this Court[2] and filed a counterclaim seeking a judicial declaration that the Lease had properly been extended past its primary term and that Chesapeake had no continuing obligation to pay delay rentals to Beaverkettle after that term ended.  ECF No. 7 at 22.

Subsequently, the parties filed cross-motions for summary judgment.  Each party asserts that there are no genuine issues of material fact with respect to its legal claims, and that it is entitled to judgment as a matter of law.  ECF Nos. 28 and 33.  Having received and reviewed each party's memorandum of law; ECF Nos. 29 and 33; and opposition and reply briefs; ECF Nos. 34, 35, 39, and 40; the Court is prepared to rule on these motions.

## II. Legal Standard

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action rather than a disfavored procedural shortcut." *F.D.I.C. v. Jeff Miller Stables*, 573 F.3d 289, 294 (6ᵗʰ Cir. 2009) (quotations

---

[2] Chesapeake removed the action to this Court on the basis of the diversity statute, which grants federal courts original jurisdiction over civil actions involving citizens of different States where the amount in controversy exceeds $75,000.  28 U.S.C. § 1332.  Chesapeake has presented evidence that it is a citizen of Oklahoma, Beaverkettle is a citizen of Ohio, and the amount in controversy exceeds $1 million.  *See* ECF No. 1.  Therefore, the statutory requirements for diversity jurisdiction have been satisfied.

omitted). "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (*quoting* Fed. R. Civ. P. 56(a)). "'A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the nonmoving party.'" *U.S. ex rel. Wall v. Circle C Construction, LLC*, 697 F.3d 345, 351 (6th Cir. 2012) (*quoting Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006)). A court deciding a motion for summary judgment "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Kuhn v. Washtenaw County*, 709 F.3d 612, 620 (6th Cir. 2013). "Where the moving party carries its initial burden, the nonmoving party 'may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.'" *Ellington v. City of East Cleveland,* 689 F.3d 549, 552 (6th Cir. 2012) (*quoting Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009)); *see Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) ("a mere 'scintilla' of evidence in support of the nonmoving party's position is insufficient to defeat summary judgment").

Cross-motions for summary judgment are examined under the usual Rule 56 standards, and a district court "'must evaluate each motion on its own merits and view all the facts and inferences in the light most favorable to the nonmoving party.'" *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrecoverable Trust*, 410 F.3d 304, 309 (6th Cir. 2005).

### III. Discussion

Two issues guide the resolution of the motions before the Court. The first issue is whether Chesapeake had properly extended the Lease past its primary term by "operat[ing]" the Property in

5

the search for oil and gas.  The second issue is whether, if so extended, the Lease nonetheless became "null and void" as a consequence of Chesapeake's failure to timely pay delay rentals to Beaverkettle in the time following the expiration of the primary term ("the secondary term").[3]

The parties agree that the Court's interpretation of the Lease is governed by Ohio law.  ECF Nos. 33-1 at 14; 40 at 11.  After all, Beaverkettle is a citizen of Ohio; ECF No. 1 at 2; the Lease was executed in Ohio; ECF No. 33-2 at 3; monies due under the Lease are required to be delivered to an Ohio address; ECF No. 29-1 at 2; and the majority portion of the Property at issue is located in Ohio. ECF Nos. 1-1 at 4; 33-1 at 14.  *See Ohayon v. Safeco Ins. Co. of Illinois*, 91 Ohio St.3d 474, 477, 747 N.E.2d 206 (2001) (where there is choice-of-law issue in contract dispute, Ohio follows law of forum having most significant relationship to transaction and parties).

In Ohio, the interpretation of written contracts, including lease agreements, is a question of law.  *Heritage Court, LLC v. Merritt*, 187 Ohio App.3d 117, 122, 931 N.E.2d 194 (2010).  Leases

---

[3] There is no claim that either party's use of the declaratory judgment mechanism is an improper vehicle to resolve this dispute.  The Declaratory Judgment Act, as well as Article III of the United States Constitution, requires the existence of an "actual controversy" between the parties before a court may assume jurisdiction.  28 U.S.C. § 2201(a).  The "actual controversy" requirement requires that the dispute be "definite and concrete, touching the legal relations of the parties having adverse legal interests," and be "real and substantial" and susceptible to specific relief as opposed to a decision that would be advisory in nature.  *Medimmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2006).  "Basically the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Id.*  In the present case, Chesapeake refuses to relinquish its claimed rights with respect to the Property on the basis that the Lease continues to be in force.  Contrarily, Beaverkettle wishes to quiet title to the Property on the grounds that the Lease expired or was voided.  These disputes are real, substantial, immediate, and involve adverse interests. Therefore, there is no question that the Court possesses jurisdiction to issue a declaratory judgment, if warranted.

are subject to the traditional rules of contract interpretation.  *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust*, 156 Ohio App.3d 65, 84, 804 N.E.2d 979 (2004).  In construing the terms of any contract, "the principal objective is to determine the intention of the parties."  *Hamilton Ins. Services, Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (1999).

"The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement."  *Kelly v. Medical Life Ins. Co.*, 31 Ohio St.3d 130, 130, 509 N.E.2d 411 (1987).  "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument."  *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority*, 78 Ohio St.3d 353, 361, 678 N.E.2d 519 (1997).  Furthermore, "[t]he meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible."  *Karabin v. State Automobile Mutual Ins. Co.*, 10 Ohio St.3d 163, 167, 462 N.E.2d 403 (1984) (quotations omitted).

"Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract."  *St. Marys v. Auglaize County Bd. of Commrs.*, 115 Ohio St.3d 387, 390, 875 N.E.2d 561 (2007).  "Contractual language is ambiguous only when its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations."  *Covington v. Lucia*, 151 Ohio App.3d 409, 414, 784 N.E.2d 186 (quotations omitted), *appeal denied*, 99 Ohio St.3d 1435, 789 N.E.2d 1117 (2003).  "If an ambiguity exists in a contract, then it is proper for a court to consider 'extrinsic evidence,' *i.e.*, evidence outside

the four corners of the contract, in determining the parties' intent." *Id.*

The above rules "contain a measure of flexibility in their application" but they are designed only to ascertain the parties' intent. *Foster*, 78 Ohio St.3d at 362. Courts are admonished that it is not their function "to rewrite the parties' contract in order to provide for a more equitable result. A contract 'does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto.'" *Id.* (*quoting Ohio Crane Co. v. Hicks*, 110 Ohio St. 168, 172, 143 N.E. 388 (1924)).

Finally, with respect to oil and gas leases in particular, it is the long-held view in Ohio that:

> The rights and remedies of the parties to an oil and gas lease must be determined by the terms of the written instrument, and the law applicable to one form of lease may not be, and generally is not, applicable to another and different form. Such leases are contracts, and the terms of the contract with the law applicable to such terms must govern the rights and remedies of the parties.

*Swallie v. Rousenberg*, 190 Ohio App.3d 473, 483, 942 N.E.2d 1109 (2010) (*quoting Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 48 N.E. 502 (1897)), *appeal denied*, 127 Ohio St.3d 1535, 940 N.E.2d 987 (2011), *reconsideration denied*.

### A. Issue One: Did Chesapeake Extend the Lease Past Its Primary Term?

Chesapeake argues that the evidence shows it properly extended the Lease past the primary term. Specifically, Chesapeake asserts that it (1) exercised its right under the Lease to form a consolidated oil and gas development unit, known as the Tharp Unit; and (2) commenced operations in the search for oil and gas on the Tharp Unit prior to May 5, 2011. ECF No. 29 at 29. In response, Beaverkettle contends that Chesapeake's activities could not have extended the Lease because Chesapeake did not first obtain Beaverkettle's approval for the Tharp Unit. ECF No. 33-1 at 22-24;

*see* ECF No. 1-1 at 23-25.

In evaluating the parties' claims, the Court looks to the following Lease provisions.  The first provision, known within the oil and gas industry as a "Habendum Clause,"[4] provides:

> This lease shall continue in force and the rights granted hereunder be quietly enjoyed by Lessee for a term of Seven (7) years and so much longer thereafter as oil and gas or their constituents shall be found on the premises in paying quantities in the reasonable judgment of Lessee or as the premises shall be operated by the Lessee in the search for oil and gas.

ECF No. 29-1 at 1.  Because there is no claim that oil and gas was ever found on the Property, the Court's focus turns to whether Chesapeake "operated" the Property in the search for oil and gas before the primary term expired.

The Lease also contains a Pooling Provision, which provides in relevant part:

> Lessor hereby grants to Lessee the right at any time to consolidate the leased premises or any part thereof or strata therein with other lands to form an oil and gas development unit of not more than 160 acres (except as stipulated in the last paragraph of Paragraph 4, on Page 2), or such larger unit as may be required by state law or regulation for the purpose of drilling a well thereon, but Lessee shall in no event be required to drill more than one well on such unit.  Lessee shall use as much of Lessor's acreage as is geologically practicable.  *Any well drilled on said development unit whether or not located on the leased premises, shall nevertheless be deemed to be located upon the leased premises within the meaning and for the provisions and covenants of this Lease to the same effect as if all the lands comprising said unit were described in and subject to this Lease* . . . . Lessee shall effect such consolidation by executing a declaration of consolidation with the same formality as this Oil and Gas Lease setting forth the leases or portions thereof consolidated, the royalty distribution and recording the same in the Recorder's office in the County in which the leased premises are located and by mailing a copy thereof to Lessor at the address hereinabove set forth . . . .

---

[4] According to one oil and gas law treatise, the "typical habendum clause of contemporary oil and gas leases" provides that the estate granted by the lease shall endure for a prescribed terms of years, *e.g.*, five or ten years, and as long thereafter as oil, gas or other minerals are produced in paying quantities. 3-6 WILLIAMS & MEYERS, OIL AND GAS LAW § 603 (2012).

ECF No. 29-1 at 3-4.  The evidence establishes that on April 14 and 15, 2011, Chesapeake filed a "Declaration and Notice of Pooled Unit" with the recorder's office of Columbiana County, Ohio, and of Beaver County, Pennsylvania.  ECF No. 29-24 at 3-15.  The executed declaration memorialized Chesapeake's consolidation of roughly 845 acres of land–encompassing approximately 183 acres of the Property owned by Beaverkettle and 661 acres of land owned by Tharp–into the Tharp Unit. ECF Nos. 29-24; 29 at 21.  Chesapeake mailed copies of the declaration to Beaverkettle on May 2, 2011.  ECF No. 29-24 at 1-2.  The evidence also shows that on May 4, 2011, the day before the primary term was set to expire, Chesapeake drilled a conductor hole for the Tharp 3H well on a portion of the Tharp Unit located on Tharp's land.  ECF No. 29-16 at 2-3.  The crux of Chesapeake's argument is that, because it properly formed a consolidated unit in accordance with the Pooling Provision, its drilling of the conductor hole for the Tharp 3H well is "deemed to be located upon the leased premises," hence, Chesapeake "operated" the Property in the search for oil and gas.

Ohio case law supports the conclusion that Chesapeake's act of drilling the conductor hole falls within the meaning of "operated" as the term is used in the Habendum Clause.  *See Kaszar v. Meridian Oil & Gas Enterprises, Inc.*, 27 Ohio App.3d 6, 7, 499 N.E.2d 3 (1985) ("[t]he commencement of operations, under an oil and gas lease, may consist of trivial and comparatively insignificant matters . . . [and includes] the performance of which has a tendency to produce the desire result" [quotations omitted]).  Beaverkettle maintains, however, that Chesapeake's drilling cannot effect an extension of the Lease because Chesapeake failed to comply with the Approval Provision of the Lease, which provides:

> Lessor shall have the right to approve drill units and locations of permanent equipment as proposed by Lessee but shall not unreasonably withhold or delay such approval.

ECF No. 29-1 at 5. Chesapeake does not dispute that it did not obtain Beaverkettle's approval for the Tharp Unit. ECF No. 29 at 17. Chesapeake also does not contest that its failure to comply with the Approval Provision would constrain its ability to extend the Lease.

The controlling question, therefore, is whether Chesapeake failed to comply with the Approval Provision. Chesapeake offers two reasons why it did not. First, Chesapeake claims that the provision did not require Beaverkettle's approval for the Tharp Unit. ECF No. 29 at 21-22. Second, Chesapeake maintains that, even if it did, Beaverkettle unreasonably withheld or delayed its approval. ECF No. 29 at 23. The Court turns to the merits of these and other related claims.

### 1. Whether Chesapeake Was Required to Seek Approval for the Tharp Unit

Chesapeake argues that although the Approval Provision granted Beaverkettle the right to approve "drill units" and "locations of permanent equipment," the Tharp Unit was not those things. Rather, the Tharp Unit was formed as an "oil and gas development unit" pursuant to the Pooling Provision. ECF No. 29 at 21-22. According to Chesapeake, these are different terms–a "drill unit" "relates to the locations of wells"; in contrast, a "oil and gas development unit" is a pooling unit. ECF No. 35 at 18. Thus, Chesapeake claims it was not required to seek approval for the Tharp Unit.

The distinction drawn by Chesapeake is unpersuasive. Although the Lease does not define the above terms, it does not distinguish them. For example, the Pooling Provision states that an oil and gas development unit is not to be more than 160 acres "except as stipulated in the last paragraph of Paragraph 4, on Page 2." ECF No. 29-1 at 3. That paragraph, in turn, specifies the circumstances

11

in which *drill units* may be larger than 160 acres.  ECF No. 29-1 at 2.  Evidently, an "oil and gas

development unit" is a "drill unit" within the meaning of the Lease.  Consistent with this definition,

Chesapeake behaved as if Beaverkettle's approval of the Tharp Unit was necessary.  Chesapeake

wrote two letters seeking Beaverkettle's approval for the Tharp Unit.  ECF Nos. 29-11, 29-13.  One

letter characterized the proposed Tharp Unit as a "drilling unit."  The letter made the following

request: "According to [the Approval Provision] of the Lease, Beaverkettle has the right to approve

proposed drilling units encompassing acreage described therein [referring to the Tharp Unit].

Accordingly, Chesapeake hereby respectfully requests Beaverkettle's approval to include" a portion

of the Property within the Tharp Unit.  ECF No. 29-11.

Contractual language is not ambiguous if its meaning can be ascertained from the four

corners of the agreement.  *Covington v. Lucia*, 151 Ohio App.3d at 414.  Because the meaning of

"drill unit" plainly encompasses "oil and gas development unit," the Court is constrained to follow

this definition, and, as a consequence, concludes that the Tharp Unit is subject to the Approval

Provision of the Lease.

### 2. *Whether Beaverkettle's Failure to Approve the Tharp Unit Was Unreasonable*

#### a. Beaverkettle's Environmental Concerns

According to the complaint, Beaverkettle raised concerns regarding the environmental impact

of the Tharp Unit, which is located near "a major tributary to Little Beaver Creek."  ECF No. 1-1 at

18.  Beaverkettle expressed "considerable anxiety about potential fracking accidents given the

sensitive location of the" Tharp Unit and requested that Chesapeake provide "written assurances of

safety measures that would provide better assurances against fracking failure and contamination of

12

the Little Beaver Creek Watershed."  ECF No. 1-1 at 18-20.  Beaverkettle avers that Chesapeake filed its declaration of consolidation without notice to Beaverkettle and that it "deliberately ignored" requests for additional information regarding the safety of Chesapeake's fracking practices.  ECF No. 1-1 at 20-21.  Beaverkettle asserts that it was not required to approve the Tharp Unit due to "Chesapeake's failure to address Beaverkettle's reasonable concerns regarding the safeguards that Chesapeake would take against fracking-related accidents that could have a disastrous effect on the Little Beaver Creek Watershed."  ECF No. 1-1 at 22.

The record establishes that Beaverkettle is committed to conserving Little Beaver Creek, which runs along the Property at issue.  ECF No. 33-2 at 2.  Jackman Vodrey, a member and "unofficial" head manager of Beaverkettle; ECF No. 31-1 at 15; testified in an affidavit that the long term goal of Beaverkettle–which members are the descendants of the original owner of the Property–is to protect Little Beaver Creek, its surrounding area, and its four major tributaries on or near the Property.  ECF No. 33-2.  As evidence of this commitment, Beaverkettle sold 1,569 acres along Little Beaver Creek to the Ohio Department of Natural Resources ("ODNR") between 1986 and 2003.  ECF Nos. 33-2 at 4; 33-6 at 1.  It has also placed 63% of the Property into a conservation easement for ODNR and the Columbiana Soil and Water Conservation District.  ECF Nos. 33-2 at 4; 33-6 at 1; 31-1 at 85.

The record also establishes that, on January 14, 2011, Chesapeake sent a letter to Beaverkettle communicating its proposal to form the Tharp Unit.  ECF No. 29-11.  On January 26, 2011, Vodrey responded and apprised Chesapeake he was "checking with the various members of Beaverkettle to get their decisions . . . ."  ECF No. 29-12.  The following day, on January 27, 2011,

13

Chesapeake requested "the favor of a response as to Beaverkettle's approval of this unit . . . ."  ECF No. 29-13.  On February 4, 2011, Vodrey sent Chesapeake a letter detailing Beaverkettle's history of conservation with respect to Little Beaver Creek, and expressing that "[t]he many recent articles and publicity about fracking accidents has caused some members of our family considerable anxiety" because the proposed well was to be drilled at the headwaters of Pine Run, a major tributary to Little Beaver Creek.  ECF No. 29-14.  Vodrey requested that Chesapeake provide "literature and documents showing what protective steps Chesapeake will be taking on the Tharp well unit, relating to safeguards against such fracking accidents."  ECF No. 29-14.  On February 16, 2011, Chesapeake emailed Vodrey information explaining hydraulic fracturing and Chesapeake's surface containment standards.  ECF No. 29-17.  On March 4, 2011, Vodrey communicated to Chesapeake that Beaverkettle had not yet arrived at a decision in light of two recent New York Times articles reporting on the environmental hazards associated with the practice of hydraulic fracturing.[5]  ECF No. 29-20.  Vodrey inquired whether Chesapeake had issued any press releases rebutting "some of the more troubling assertions in the stories . . . ."  ECF No. 29-20.  There is no evidence that Chesapeake responded to Vodrey's query.  Rather, on May 2, 2011, Chesapeake notified Vodrey that because it had not received a response to its requests for approval, Chesapeake had proceeded to record declarations of consolidation for the Tharp Unit.  ECF No. 29-24.

Chesapeake contends that Beaverkettle's failure to approve the Tharp Unit was

---

[5] Vodrey cited the hyperlinks to these articles in his correspondence.  *See* Ian Urbina, *Regulation Lax as Gas Wells' Tainted Water Hits Rivers*, N.Y. Times, February 26, 2011, *available at* http://www.nytimes.com/2011/02/27/us/27gas.html (last visited August 12, 2013) and Ian Urbina, *Wastewater Recycling No Cure-All in Gas Process*, N.Y. Times, March 1, 2011, *available at* http://www.nytimes.com/2011/03/02/us/02gas.html (last visited August 12, 2013).

unreasonable and intentionally dilatory.  According to Chesapeake, Beaverkettle's intention was to prevent the Lease from being extended "so that [it] could negotiate a new lease with higher compensation."  ECF No. 40 at 20.  In support of its argument, Chesapeake points out that: (1) Beaverkettle's concerns about hydraulic fracturing were "non-specific," ECF No. 29 at 24; (2) Chesapeake provided information to Beaverkettle in response to Beaverkettle's queries about its drilling practices, ECF No. 29-17; (3) the Pennsylvania Department of Environmental Protection approved the surface location of the proposed Tharp 3H well as well as Chesapeake's sediment and erosion plan, ECF No. 29-16 at 1; (4) nothing in the record establishes that Chesapeake did not use its best efforts to minimize ecological damage, ECF No. 29 at 24; (5) one of Beaverkettle's members, Ted Boyd, emailed Vodrey to say that he had "no concerns about the use of fracking," ECF No. 29-23; (6) Beaverkettle's members never voted to approve or disapprove the Tharp Unit, ECF No. 31-2 at 2; (7) the location of the proposed Tharp 3H well was more than 300 feet from any streams or waterways, which meets the riparian setback limitation set forth in the Lease, ECF No. 29-16 at 2; and (8) Beaverkettle held a "managers' meeting" on September 14, 2010, in which the managers discussed the "Marcellus Boom"[6] and the prospect of negotiating better lease terms or obtaining a new lease with higher compensation, ECF No. 31-2 at 19.

The Court concludes that the foregoing evidence demonstrates a genuine issue as to whether

---

[6] "The Marcellus Shale is a gas-rich formation deep underground that extends across Pennsylvania, West Virginia, New York, Ohio and Maryland . . . ."  *Marcellus Shale Gas Production Rising Faster Than Predictions, Having National Impact*, Washington Post, August 15, 2013, *available at* http://www.washingtonpost.com/business/marcellus-shale-gas-production-rising-faster-than-predictions-having-national-impact/2013/08/15/f986940a-0574-11e3-bfc5-406b928603b2_story.html (last visited August 17, 2013).

Beaverkettle's actions were reasonable.  The evidence supports Beaverkettle's assertions that it is committed to protecting Little Beaver Creek, that it was concerned about the environmental effects of hydraulic fracturing, and that during the time the parties were discussing the Tharp Unit, Beaverkettle was aware of recent news concerning the environmental hazards of "fracking" and its effect on nearby waterways.  The literature provided by Chesapeake does not establish that Beaverkettle's concerns were resolved.[7]  On the other hand, Beaverkettle's commitment to conservation must be viewed in conjunction with its willingness to permit its land to be drilled. There is evidence that, apart from Beaverkettle's environmental goals, Beaverkettle was attracted to the possibility of reaping the rewards of the "Marcellus Boom" and had been motivated to seek better compensation than that provided under the Lease.  There is no dispute that the location of the Tharp 3H well complied with the riparian setback limitation of the Lease.  Moreover, although at least one Beaverkettle member had no concerns about the practice of fracking, Beaverkettle never voted to decide whether to approve the Tharp Unit.  In fact, Beaverkettle did not formally express its disapproval.  Such evidence is sufficient to create an issue of fact as to whether Beaverkettle's conduct was purposefully dilatory and designed to prevent Chesapeake from extending the Lease.

---

[7] Furthermore, according to the U.S. Environmental Protection Agency, research is ongoing to understand the potential risks associated with fracking.  The EPA acknowledges that some of the "well known" concerns include "[s]tress on surface water and ground water supplies from the withdrawal of large volumes of water used in drilling and hydraulic fracturing"; "[c]ontamination of underground sources of drinking water and surface waters resulting from spills, faulty well construction, or by other means"; "[a]dverse impacts from discharges into surface waters or from disposal into underground injection wells"; and "[a]ir pollution resulting from the release of volatile organic compounds, hazardous air pollutants, and greenhouse gases." U.S. Environmental Protection Agency, Natural Gas Extraction - Hydraulic Fracturing, http://www2.epa.gov/hydraulicfracturing#improving (last visited August 30, 2013).

16

Given the conflicting evidence, the reasonableness of Beaverkettle's actions is better decided by a trier of fact.  *See Blizzard v. Marion Technical College*, 698 F.3d 275, 282 (6th Cir. 2012) (on summary judgment court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail" [quotations omitted]).  Accordingly, this issue will not be decided on summary judgment.

b.  Discrepancy Between Proposed and Final Tharp Unit

Although Beaverkettle argues that its environmental concerns gave it reasonable grounds to withhold approval for the Tharp Unit, Beaverkettle also argues that Chesapeake failed to properly seek the required approval in the first place.  ECF No. 33-1 at 23.  In particular, Beaverkettle asserts that the description of the Tharp Unit in the recorded declaration is not the same description as that proposed by Chesapeake to Beaverkettle.  ECF No. 33-1 at 23.  Beaverkettle points out that the description proposed by Chesapeake included roughly 179 acres of the Property, whereas the recorded declaration shows that approximately 183 acres of the Property were incorporated into the Tharp Unit.  ECF No. 39 at 8.  The Court is not persuaded by Beaverkettle's argument.

Timothy Andrews, a Senior Landman for Chesapeake, explains the discrepancy.  *See* ECF No. 35-3.  According to Andrews, the description reviewed by Beaverkettle was based on his initial estimate of the size of the three parcels from the Property (Parcel ID #44, 56, and 63) that Chesapeake hoped to join with Tharp's land.  He estimated the total size at 179 acres.  Subsequently, Chesapeake engaged in a comprehensive title review of all the parcels included in the Tharp Unit.  The review revealed that the three parcels owned by Beaverkettle were slightly larger, roughly 183 acres.  Accordingly, Chesapeake made the appropriate adjustment to the number of acres assigned

17

to the three parcels when it recorded its declaration.  Significantly, the declaration did not add additional parcels of Beaverkettle land, nor did it alter the three parcels to be joined.

Beaverkettle cannot credibly claim that Chesapeake failed to properly seek approval on the basis of this *de minimus* difference in acreage. The difference was the result of a slight computation error that in no way deprived Beaverkettle of the ability to evaluate Chesapeake's proposal, and Beaverkettle does not suggest that its assessment of the Tharp Unit would have been any different had it known that 183 acres, instead of 179, were to be included.  The final recorded declaration includes, in all relevant respects, the same information that Beaverkettle reviewed.  In particular, it identifies the same parcels of land that Chesapeake had asked Beaverkettle's approval   to consolidate.

Beaverkettle claims that the Court should not consider Andrews' explanation, which was provided in a declaration to this Court, because it contradicts his earlier deposition testimony in which he stated that the information in the recorded declaration and the information given to Beaverkettle were "[n]ot identical."  ECF No. 39 at 8-9; *see* ECF No. 32 at 74.  The Court does not view Andrews' explanation as a contradiction, but as a clarification of his earlier testimony.  The Court's reliance on it is therefore proper.

Based on the foregoing, the Court concludes that, contrary to Beaverkettle's claim, Chesapeake did not fail to properly seek approval for the Tharp Unit.

### c.  Size Requirements

Beaverkettle next argues that "it would not have been unreasonable for Beaverkettle to withhold its consent" with respect to the Tharp Unit because the Tharp Unit does not comply with

18

the size requirements set forth in the Lease.  ECF No. 33-1 at 23-24.

The Pooling Provision provides in relevant part that the lessee may form "an oil and gas development unit of not more than 160 acres *(except as stipulated in the last paragraph of Paragraph 4, on Page 2) . . . .*"  ECF No. 29-1 at 3 (emphasis added).  That paragraph provides:

> Lessee shall be entitled to plat drill units in acreage size as large as one hundred sixty (160) acres per drill unit drilled in the Silurian formation or above.  However, if Lessee drills in the Ordovician formation or below, and requests of Lessor in advance that larger acreages be assigned to such lower-level drill units, a 2,000 radial surface footprint from the wellbore, on a horizontal basis, will be the minimum standard for such wells, to be mutually agreed upon but such agreement not to be unreasonably withheld.

ECF No. 29-1 at 2.

The Tharp Unit is roughly 845 acres.  ECF No. 29-24. Had Chesapeake drilled in the Silurian formation or above, the Tharp Unit would be in violation of the 160 acre limitation set forth in the forgoing paragraph.  Because there is no dispute that Chesapeake drilled the Tharp 3H well into the Ordovician formation; ECF Nos. 35 at 22 n.5; 39 at 10; the Tharp Unit is subject to the following principle:  If (A) Chesapeake "requests of Lessor in advance that larger acreages be assigned to such lower-level drill units," then (B) "a 2,000 radial surface footprint from the wellbore, on a horizontal basis, will be the minimum standard for such wells, to be mutually agreed upon but such agreement not to be unreasonably withheld."  ECF No. 29-1 at 2.  Chesapeake properly made advance requests for larger acreages on January 14 and 27, 2011, when it sought Beaverkettle's approval for the Tharp Unit.  ECF Nos. 29-11, 29-13; *see* ECF No. 29-14.

Beaverkettle contends that the Tharp Unit fails to comply with the requirement that there be, in Beaverkettle's words, "a minimum 2,000-foot radial footprint from the wellbore for . . . the

19

Tharp 3-H well." ECF No. 39 at 10. Beaverkettle submits a scaled diagram of the Tharp Unit, along with Vodrey's affidavit in which he contends, based upon his examination of the diagram, that a circle with a radius of 2,000 feet cannot fit within the Tharp Unit. ECF No. 33-2 at 6-7.

At this juncture, the Court will not consider Beaverkettle's argument because it was not pleaded in the complaint. The complaint alleges that "Chesapeake failed to obtain approval from Beaverkettle to plat a drill unit larger than 160 acres drilling into the Ordovician formation or below." ECF No. 1-1 at 25. This is a very different claim from the one that Beaverkettle now asserts, for the first time, in its motion for summary judgment. In order to properly assert this claim, Beaverkettle must first seek leave from the Court to amend its complaint.

Even were the Court to consider this claim, however, Beaverkettle would not be entitled to summary judgement. Beaverkettle's evidence is based entirely upon Vodrey's informal estimate of the dimensions of the Tharp Unit using a scaled diagram. It lacks the precision necessary to demonstrate the absence of any genuine issue of material fact. This is especially so because Beaverkettle is the party that bears the burden of proof at trial with respect to this claim.[8]

### 3. Summary

Based on the foregoing, genuine issues of material fact exist as to whether Beaverkettle unreasonably withheld or delayed approval for the Tharp Unit. Therefore, the question of whether

---

[8] Because the Court has concluded that Beaverkettle's argument regarding the radial surface of the Tharp Unit is procedurally improper, and, in any event, would not entitle it to summary judgment, the Court declines to address Chesapeake's related defenses, namely, that Beaverkettle's argument has been waived; ECF No. 35 at 22; and that the radial surface requirement is ambiguous. ECF No. 40 at 22. Prudence counsels against addressing these defenses not only because it is unnecessary to the resolution of the immediate motions, but also because they are not briefed with particular rigor or depth by either party.

Chesapeake properly extended the Lease past its primary term is reserved for trial.

The Court notes that, even if the Lease had been extended, Beaverkettle may still prevail on summary judgment if it can demonstrate that Chesapeake had an obligation to pay delay rentals during the secondary term.  It is to this question that the Court now turns.

### B. Issue Two: Even If the Lease Were Extended Past the Primary Term, Did Chesapeake Have a Continuing Obligation to Pay Delay Rentals to Beaverkettle?

Beaverkettle asserts that Chesapeake's failure to timely pay delay rentals after the expiration of the primary term caused the Lease to become null and void as to the undrilled portion[9] of the Property.  ECF No. 33-1 at 5.

The Delay Rental Provision of the Lease provides in relevant part:

This lease, however, shall become null and void and all rights of either party hereunder shall cease and terminate unless within 12 months from the date hereof, Lessee commences the drilling of a well on the premises for production of oil and gas *or unless Lessee shall pay a delay rental of Ten dollars ($10.00) per acre each year commencing on the date of this lease, payments to be made quarterly in advance. Said delay rental shall not be due and payable for each acre which is contained within an approved drilling plat*, provided that once Lessee commences drilling, Lessee proceeds with due diligence to complete such well, and once completed, such well continues to produce and sell oil and gas in paying quantities. . . . .

The payment for the first quarter shall be made not later than the date of this Lease. Once a well is drilled on the Lease, said Lease shall be held by production *and Lessee shall be entitled to maintain all undrilled acreage under this Lease by paying delay rentals as provided above.*

ECF No. 29-1 at 1-2 (emphasis added).

Because a well was not drilled on the Property within the first year of the Lease, the Lease

---

[9] Beaverkettle does not specify whether "the undrilled portion" refers to the entire Property or only that portion outside of the Tharp Unit.  For the purposes of resolving the cross-motions for summary judgment, this question need not presently be resolved.

provides that it "shall become null and void" unless Chesapeake pays delay rentals to Beaverkettle in the amount of $10 per acre each year for each acre not contained within an "approved drilling plat."  The provision specifies that the payments are to be made "quarterly in advance."  And, when a well is drilled on the Property, the Lease shall be "held by production" and Chesapeake "shall be entitled to maintain all undrilled acreage" by "paying delay rentals as provided above."

The record establishes that Chesapeake did not pay the delay rentals due on May 5, 2011, and August 5, 2011, for the quarters beginning on those dates.  ECF No. 33-2 at 5.  According to Beaverkettle, the Lease therefore became void with respect to the undrilled acreage within the Property.  ECF No. 33-1 at 17-18.  Chesapeake disputes this conclusion.  Its main contention is that "[u]nder well-established oil and gas law . . . the obligation to pay delay rentals payments only applies to the primary term, and thus terminates once the Lease has been extended into its secondary term."  ECF No. 29 at 27.  Therefore, argues Chesapeake, once the Lease was extended into the secondary term, it had no obligation to pay delay rentals.  ECF No. 29 at 28-29.

Chesapeake further claims that, in accordance with the "prevailing" law, the Court must presume that the Habendum Clause is "indivisible"–meaning that "engaging in operations in the search for oil and gas *anywhere* on the leasehold premises, or on pooled acreage, is sufficient to extend the *entire* lease into the secondary term, unless there is clear and explicit language in the habendum clause to the contrary."  ECF No. 29 at 30 (emphasis in original).  This principle, when viewed in conjunction with the premise that delay rentals apply only in the primary term, forms the bedrock of Chesapeake's argument, namely, that its rights under the Lease continue to be in force for the entire Property–including the undrilled acreage–and that it does not need to pay delay rentals

22

for such undrilled acreage in order to maintain its rights in regard to them. ECF No. 35 at 12.

The issue before the Court may be summarized as follows: Does the law impose a specific meaning for "delay rentals"–namely, that it is an obligation incurred only during the primary term of an oil and gas lease–even though the lease itself does not explicitly set forth such a definition or requirement? The authorities presented by Chesapeake do not establish that it does. True, the cases cited by Chesapeake recognize that delay rentals have traditionally been understood to apply during the primary term . *See PEC Minerals LP v. Chevron U.S.A., Inc.*, 439 Fed. Appx. 413, 417 (5th Cir. 2011) (applying Texas law); *Burkett v. Exco Resources (PA), LLC*, No. 2:11CV1394, 2012 WL 1019025 at \*6 n.9 (W.D. Pa. March 26, 2012) (applying Pennsylvania law); *Wiser v. Enervest Operating, LLC*, 803 F. Supp.2d 109, 118 (N.D.N.Y. 2011) (applying New York law; *Jacobs v. CNG Transmission Corp.*, 332 F. Supp.2d 759, 786 (W.D. Pa. 2004) (applying Pennsylvania law); *see also* 3-6 WILLIAMS & MEYERS, OIL AND GAS LAW § 605 (2012) (*citing Jacobs* and *Burkett*). It would be erroneous, however, for the Court to go so far as to conclude that the term must therefore, as a matter of law, be defined in the manner urged by Chesapeake. Ohio has never made such a sweeping pronouncement. Furthermore, that an esoteric lease term has traditionally been understood one way does not, pursuant to the law of contracts, necessarily bind every oil and gas lease to that same understanding. "[A]n oil and gas lease must be determined by the terms of the written instrument, and *the law applicable to one form of lease may not be, and generally is not, applicable to another and different form*." *Harris v. Ohio Oil Co.*, 57 Ohio St. at 129 (emphasis added). Were the Court to accept Chesapeake's blanket rule, the Court would be in derogation of its duty to examine the *particular contract* before it, and the specific language and provisions

23

contained therein, to ascertain the intention of the parties.

The Court's review of the oil and gas leases in the cases cited by Chesapeake reveals at least one significant difference between the leases discussed in those cases and the one in dispute. Each of the leases in the above cases contains language confining the payment of delay rentals to the primary term.[10]  In contrast, nothing in the Lease at issue explicitly limits the payment of delay rentals to the primary term, or excuses Chesapeake from paying delay rentals for "undrilled acreages" in the secondary term if it wishes to maintain its rights over those acreages.  The Lease simply provides that in order to prevent it from becoming "null and void," the lessee must commence the drilling of a well within twelve months (which was not done), or pay delay rentals of $10 per acre for each acre not contained within an approved drilling plat.  The Lease also specifies that once a well is drilled, the lessee "shall be entitled to maintain all undrilled acreage" by paying delay rentals.

Without importing definitions into the Lease, it would appear that the Lease compels Chesapeake to pay delay rentals for undrilled acreages, without limitation.  Therefore, even

---

[10] *See PEC Minerals*, 439 Fed. Appx. at 417 ("Paragraph 5(f) . . . establishes an annual delay rental of $1 per acre of undeveloped land 'until the end of the said primary term.'"); *Burkett*, 2012 WL 1019025 at *1 (under lease, "Grantee could avoid forfeiture if the Grantors were paid quarterly rental payments . . . during the primary term."); *Wiser*, 803 F. Supp.2d at 120 (lease provided that "the Lessee shall pay to the Lessor, in advance, [delay rentals] every twelve (12) months until work for the drilling of a well is commenced," which must occur during primary term in order for Lease to be extended); *Jacobs*, 332 F. Supp.2d at 767 (compare language that "Lessee covenants and agrees to pay a rental . . . beginning June 16, 1956, until a well yielding royalty to the lessor is drilled on the premises, or until any sand or sands under the leased premises is utilized for the storage of gas" with language that lease is extended into secondary term if property "is operated by [the defendant] in search for oil or gas or as long as gas is being stored, held in storage, or withdrawn from the premises").

24

accepting Chesapeake's proposition that the Habendum Clause is indivisible and that its work on the Tharp Unit was sufficient to carry the entire Lease into the secondary term, it would appear that Chesapeake still carried an obligation to pay delay rentals for the undrilled portion of the Property.

Citing *PEC Minerals*, 439 Fed. Appx. at 417-18, and *Northup Properties, Inc.*, 567 F.3d 767, 772 (6th Cir. 2009), Chesapeake argues that only "clear and explicit" language may permit the payment of delay rentals to maintain the enforceability of an oil and gas lease as to undrilled acreages in the secondary term.  ECF No. 40 at 11.  Chesapeake's reliance on these cases is improper.  The issue in *PEC Minerals* was whether language in a delay rental provision could modify the habendum clause of the oil and gas lease at issue "such that acreage is held by the Lease past the primary term only with regard to the property in the particular units of land where production continues."  439 Fed. Appx. at 416.  The habendum clause provided that the lease shall be for a term of ten years "and as long thereafter as oil, gas, or other minerals is produced from said land or land with which said land is pooled hereunder."  *Id.* at 414.  Because Texas law, which governed the dispute, follows the rule of indivisibility, there existed a presumption that production from any part of the leasehold would extend the entire lease into the secondary term.  While, however, there was language in the delay rental provision suggesting that the lease would continue in force only with respect to those units of land where there was production of oil, the Fifth Circuit rejected the argument that such language could divide the lease.  *Id.* at 417-418.  The court held that the language was not "clear, precise, and unequivocal."  *Id.*  In addition, because the language was "inextricably embedded" in the delay rental provision, the court held that it applied only during the primary term of the lease–the term in which delay rentals were due.  *Id.* at 417.

*PEC Minerals* does not stand for the legal proposition asserted by Chesapeake, and it is inapposite to this case.  First, *PEC Minerals* did not address whether the payment of delay rentals could maintain the enforceability of the lease during the secondary term.  That question was never in contention because the lease *explicitly limited* delay rentals to the primary term.  *PEC Minerals*, 439 Fed. Appx. at 417 (delay rentals due "'until the end of the said primary term.'")  Second, the issue in *PEC Minerals* was whether the lease was extended to the secondary term only with respect to the part of the leasehold where there was production of oil.  In contrast, the issue here is entirely different, that is, whether the payment of delay rentals was required in the secondary term in order to maintain Chesapeake's rights with respect to the undrilled acres of the leasehold.

Chesapeake's reliance on *Northup Properties*, which applied Kentucky law, similarly misses the mark.  In that case, the Sixth Circuit held that Kentucky law will not permit the extension of an oil and gas lease into the secondary term by way of delay rentals unless there was unambiguous language permitting such an extension.  *Northup Properties*, 567 F.3d at 772.  Even assuming that Ohio would follow this rule, it is not relevant to the present case.  Beaverkettle does not claim that the Lease may be extended by the payment of delay rentals.  ECF No. 34 at 6.  The Habendum Clause clearly provides that the Lease is extended if Chesapeake "operated" the Property in the search for oil and gas.  ECF No. 29-1 at 1.  Rather, Beaverkettle's contention is that, once extended, Chesapeake was still obligated to pay delay rentals to maintain the undrilled portion of the Property.  ECF No. 34 at 6.

Chesapeake's strongest argument is that the Court should consider evidence that  "delay rental" is a term of art in the oil and gas trade with a specialized meaning that the Court should

26

adopt to interpret the Lease.  ECF No. 35 at 16 n.3.  To that end, Chesapeake submits the report of Bruce Kramer, a former law professor and an expert in the customs and practices of the oil and gas industry as they relate to oil and gas leases.  ECF No. 35 at 16 n.3.  According to Kramer, "[t]he custom and practice of the oil and gas industry . . . is that 'delay rental' payments apply during the lease's primary term."  ECF No. 42-1 at 6.

Citing *Sears, Roebuck & Co. v. Cleveland Trust Co.*, 355 F.2d 705, 708-09 (6th Cir. 1966), Beaverkettle contends that because not all parties knew of the trade usage, the Court is prohibited from "applying Chesapeake's extra contractual meaning."  ECF No. 33-1 at 18.  Beaverkettle's reasoning is not well-taken.  First, as the Court discusses in detail below, there is a genuine issue of material fact as to the parties' understanding of the meaning of delay rentals.  Second, the Sixth Circuit in *Sears* ruled that the trial court permissibly barred evidence of custom and usage because (1) the evidence would have produced an absurd result; (2) neither parties were members of the trade; (3) no proof had been offered to show that either party was aware of the custom or usage; and (4) the custom or usage was a local one.  *Id.* at 708.  None of the foregoing apply in the instant case. Admitting Kramer's report will not produce an absurd result because it will shed light on the intent of the parties.  O&G, the original lessee and signatory to the Lease, was undeniably a member of the oil and gas industry.[11]  *See Jeanes v. Henderson*, 703 F.2d 855, 861 (5th Cir. 1983) (*Sears* "held only that evidence of trade usage is inadmissible when *neither* party to the contract was a member of the trade" [emphasis in original]).  Finally, Kramer's report is evidence that "delay rental" has

_____

[11] Vodrey testified that O&G signed the Lease as a proxy for Petro Evaluation Services, Inc. ("Petro"), an entity that manages the drilling of oil and gas wells, and that the Lease was negotiated and drafted by representatives of Beaverkettle and Petro. ECF No. 31-1 at 41-46.

27

a settled meaning within the oil and gas industry, and, therefore, it was within O&G's knowledge.

Moreover, the Court is not constrained to rely on Kramer's report only if the Lease is ambiguous. "Delay rental" is a technical term which meaning is not readily apparent in the Lease and which is susceptible to evidence of trade usage. "There is no requirement that an agreement be ambiguous before evidence of a usage of trade can be shown, nor is it required that the usage of trade be consistent with the meaning the agreement would have apart from the usage." 92 OHIO JUR. 3D, USAGES AND CUSTOMS; COURSE OF DEALING § 32 (2013); *see* K. FARNSWORTH, CONTRACTS § 7.13, P.473 (4TH ED. 2004); RESTATEMENT (SECOND) OF CONTRACTS § 222 (1981), COMMENT B. Rather, "[u]nder Ohio law, evidence of usage of trade . . . can be admitted for purposes of clarifying an indefinite contractual term"; *Dana Partners, LLC v. Koivisto Constructors & Erectors*, No. 2011-T-0029, 2012 WL 6783637 at *5 (Ohio App. 11 Dist., December 31, 2012); a "doubtful" term; *Humphrey v. Dept. of Mental Health Retardation*, 14 Ohio App.3d 15, 17, 469 N.E.2d 981 (1984); or a term with a technical meaning. *Marisay v. Perrysburg Machine & Tool, Inc.*, 37 Ohio App.3d 35, 38, 523 N.E.2d 329 (1987); *see Foster*, 78 Ohio St.3d at 361 ("Technical terms will be given their technical meaning, unless a different intention is clearly expressed."). Here, because Chesapeake has submitted evidence that "delay rental" is a term with a specific meaning and function in the oil and gas industry, the Court may properly consider it.

Chesapeake's proof does not, however, end the Court's inquiry. "[A] contract should only be interpreted consistent with a usage of trade if each party knows or has reason to know of the usage and neither party knows or has reason to know that the other party has an intention inconsistent with the usage." *Dana Partners*, 2012 WL 6783637 at *5; *see Fidelity Mortgage v.*

28

*Bruno Airport Industry*, No. 1544, 1981 WL 5370 at *3 (December 10, 1981, Ohio App. 2 Dist.);

*see also* K. FARNSWORTH, *supra* P.472; RESTATEMENT (SECOND) OF CONTRACTS, *supra* § 221.

As evidence that Vodrey, who signed the Lease on behalf of Beaverkettle, knew the industry

meaning of delay rentals, Chesapeake points to evidence that Vodrey is himself an attorney, that

he helped prepare the original draft of the Lease, and that he helped draft three prior oil and gas

leases for Beaverkettle and its predecessor.  ECF No. 31-1 at 29, 49-50, 64-66.

The Court concludes that there is a genuine issue regarding what the parties understood

"delay rentals" to mean.  Although Vodrey is an attorney who has some experience preparing oil

and gas leases, his experience cannot be characterized as extensive.  And, while he has negotiated

oil and gas leases in the past for the purpose of capitalizing Beaverkettle's land, he is not a member

of the oil and gas industry.  Vodrey testifies in his affidavit that, during the negotiations for the

Lease, he did not attribute "any special or technical meaning to any of the terms in the" Delay

Rental Provision.  ECF No. 33-2 at 3.  His testimony is corroborated by the absence of any

contractual language defining the duration for which delay rentals are to be paid.  Given the absence

of such language, there is also an issue as to whether the original lessee, O&G (or Petro), had reason

to know that Vodrey had an understanding of the term that was inconsistent with the trade usage.

Finally, Beaverkettle submits evidence that even Chesapeake may not have understood the term in

accordance with its industry meaning.  In an internal Chesapeake email, Andrews, Chesapeake's

Senior Landman, expressed his belief that, in the secondary term, "one well can hold the entire

4,100 acre lease *as long as delay rentals are paid on the undrilled acreage . . . .*"  ECF No. 34-2

at 1 (emphasis added) *see* ECF No. 33-1 at 20-21.

In following this approach to interpreting the Lease, the Court is mindful that the "[p]rime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract." *Humbert v. United Ohio Ins. Co.*, 154 Ohio App. 3d 540, 543, 798 N.E.2d 25 (internal quotations omitted), *appeal denied*, 100 Ohio St. 3d 1531, 800 N.E.2d 48 (2003). The Court will not, at Chesapeake urging, foist an esoteric definition of a contract term, though known to members of a trade, upon a non-member when the latter had no reason to know of that definition and when, indeed, the contract actually suggests a contrary meaning. To do so would be to violate basic principles of contract law and to open the door for abuse.

Finally, the Court rejects Chesapeake's claim, raised in a footnote, that were the Court to conclude that Chesapeake was required to pay delay rentals in the secondary term, any breach of this obligation would not nullify the Lease. ECF No. 35 at 13 n.2. The Delay Rental Provision provides that once a well is drilled on the Lease, "said Lease shall be held by production and Lessee shall be entitled to maintain all undrilled acreage under this Lease by paying delay rentals as provided above." ECF No. 29-1 at 2. Chesapeake's failure to pay delay rentals, therefore, means the loss of its entitlement to maintain its rights as to undrilled acreage.

Because there is a genuine issue of material fact as to the parties' understanding with respect to the term "delay rental" as it is used in the Lease, the issue of whether Chesapeake was required to tender such payments during the secondary term must be resolved at trial.

30

**IV. <u>Conclusion</u>**

Based on the foregoing analysis, the Court denies both Beaverkettle's and Chesapeake's

motion for summary judgment.


IT IS SO ORDERED.


 August 30, 2013                                             _/s/ Benita Y. Pearson_          
Date                                                      Benita Y. Pearson
                                                      United States District Judge